Filed 1/7/26  P. v. McIntire CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANGEL MARTINE McINTIRE,<br><br>    Defendant and Appellant. | E083907<br><br>(Super.Ct.No. SWF2201733)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Francisco Navarro, Judge.  Affirmed.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Paige B. Hazard and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Angel Martine McIntire of the voluntary manslaughter of his pregnant girlfriend. On appeal, he contends that there is insufficient evidence to support the conviction and that the trial court prejudicially erred by admitting evidence of prior acts of domestic violence and by sentencing him to the upper term. We affirm.

BACKGROUND

The People charged McIntire with the murder of Diana Perez and the fetus she was carrying, Baby Doe. (Pen. Code § 187, subd. (a); unlabeled statutory references are to this code.)

I. *Events from 2019 through early December 2020*

Perez and McIntire started dating sometime in 2018 or 2019. In the first part of 2019, the couple lived in a rented room in a house. The landlord testified that McIntire acted aggressively toward Perez and would "keep her locked up" in the bedroom, getting upset and yelling at her when she left the room. When they were inside their bedroom, the landlord heard arguing, McIntire knocking on doors and walls, and McIntire yelling at Perez. In September 2019, the couple moved to a room in a different house, where Perez always seemed "very nervous, [and] very scared."

In September 2019, Perez told her family that she was pregnant. Before Perez started dating McIntire, she had a close relationship with her younger sister, Christy P., but Perez became "very distant" thereafter. Before she disclosed the pregnancy, Perez told Christy that McIntire had both physically and verbally abused her. Perez feared McIntire and was unable to defend herself because McIntire was "larger and stronger."

2

He had threatened her with a gun. He also physically abused her after she became pregnant. Perez told Christy that McIntire "would call her bad words; that he would push her and beat her up, but that he would always try not to leave any marks on her, but he would hurt her." McIntire threatened that if Perez called the police, then he would take revenge and kill her.

The relationship ended in December 2019 after Perez called 911 from her workplace. Perez was "very scared" and first called Christy, because McIntire threatened to kill her and said "that if she left him, he was going to cut her stomach and get the baby out." Perez's workplace "was the only time that [McIntire] wasn't watching, and that was when [Perez] could call the police." Christy urged Perez to call the police.

A local police officer responded to the 911 call and found McIntire driving his car with a loaded nine-millimeter handgun inside the car. The officer arrested McIntire for a weapons violation because the firearm was not stored properly. The officer met briefly with Perez, who appeared fearful and was "crying profusely." The officer referred Perez to the Riverside County Sheriff's Department, because the local police department did not have jurisdiction over domestic violence incidents.

After McIntire's arrest, Perez moved in with Christy for a short period and then moved in with one of her aunts. In December 2019, Perez performed an internet search for something like, "'Is a person born or made a sociopath?'" In January 2020, Perez obtained a two-year restraining order protecting her from McIntire.

In December 2019, McIntire met Ana G., whom he dated until April 2020. McIntire moved into Ana's apartment after about one month after meeting her. McIntire subsequently became jealous, possessive, and controlling, and he started "verbally abus[ing]" Ana, calling her "'stupid'" and "a bitch."

In April 2020, McIntire asked Ana why she was "'a fucking bitch,'" and she told him that the relationship "'was over.'" He got upset and pushed her with both hands. He pushed her so hard that she fell over the edge of the bed. Ana told McIntire to leave. She attempted to call 911, but he grabbed her phone, threw it on the floor, and broke it. He then broke her laptop. Ana told McIntire that she was not afraid of him, and he responded, "'You should be.'" Ana was afraid but pretended she was not in order to protect her children. She called the police after McIntire left.

McIntire later attempted to resume a romantic relationship with Ana and warned her that he would kill anyone else she started dating . McIntire had previously told Ana that if he ever killed someone, then "he would take them to the reservation—the Indian reservation and dump the body."

In May 2020, Perez gave birth to the couple's daughter, Celeste. McIntire and Perez were not together when Celeste was born. The day after her birth McIntire's mother told Perez that McIntire had a right to know where his daughter lived, and she threatened legal action if Perez did not allow McIntire to see Celeste. Perez expressed concern to McIntire's mother about how McIntire treated her, but she allowed them to visit.

4

A short time after McIntire started visiting Celeste in May and July 2020, Perez and McIntire resumed their relationship. Perez moved in with McIntire in July. Later that month, Perez contacted her ex-boyfriend, Eduardo L., and asked him for help. Eduardo picked her up, and she appeared "[u]nrecognizable" and "really terrified and stressed." She had visible injuries, including "bumps on her head," a swollen face, and bruises on her arms. Perez told Eduardo that McIntire "had pushed her and started hitting her." The incident occurred on July 15, 2020, at the couple's residence.

Perez and Celeste moved in with Eduardo and his mother. Eduardo's mother said that Perez "looked scared" when she moved in and had marks on her neck and bruises on her chest. Perez told Eduardo's mother that McIntire "had put her on the sofa and had placed his knee on her and grabbed her by the neck," "choking her." Perez said that McIntire "always hit her" and threatened to take away Celeste by having Perez deported.

On July 20, 2020, Eduardo took Perez to a sheriff's station to report the July 15 incident. Deputy Jason Rodrigues spoke with her, and she appeared "nervous, scared, shy, [and] very uncomfortable." Rodrigues photographed Perez's injuries, such as bruising around both eyes and on her arms and chest. Perez told Rodrigues that she had sustained the injuries when a verbal altercation with McIntire became physical.

Perez initially told Eduardo that she did not want McIntire to know her location, but Eduardo later saw McIntire's family drop off Perez at the house. She told him that the family had wanted to see Celeste. Eduardo's mother once saw McIntire slowly drive by the house. McIntire's mother told Perez that the government would take Celeste away

5

from her because she did not have a place to live. In early September 2020, Perez resumed her relationship with McIntire and moved out of Eduardo's house.

Perez and McIntire subsequently rented a room together in a house on Crooked Branch Way in San Jacinto, California. Perez worked at a restaurant.

In November and early December 2020, Perez talked to her sister Angeles P. about leaving McIntire. Angeles and Perez had a close relationship and spoke every day. Angeles lived in Tijuana, Mexico, and she wanted Perez to move in with her. Perez refused the offer so that Celeste could remain in the United States. Angeles said that Perez would "never leave" Celeste but was "[v]ery afraid" of how McIntire would react if she took Celeste.

On November 30, 2020, Perez had an appointment with an obstetrician, who confirmed that she was seven weeks pregnant. The doctor was "stunned" that she was pregnant by McIntire in light of "the restraining order and all the drama," and Perez was "quite somber." The doctor prescribed prenatal vitamins and scheduled an appointment for December 14. Perez "was a great, compliant patient," and she "never missed an appointment" during her first pregnancy.

A coworker of Perez's said that Perez appeared "somewhat nervous" and "worried" when they worked together in early December 2020. Perez had confided some details of her relationship to that coworker, who encouraged her to leave McIntire. Perez was afraid to leave "because she had already tried to leave him, and he learned where she

6

was.  He went over there to get her, pick her up, and he raised hell."  And Perez worried that McIntire would take Celeste away.

II.     *Perez disappears*

On December 4, 2020, Perez spoke on the phone with two of her sisters, saw a friend in person, and was taken by McIntire to her aunt's house to get prenatal vitamins. Everyone but her aunt said that she seemed nervous.  Perez spoke with Angeles several times by voice and video.  Angeles said that Perez seemed "[n]ervous and like she wanted to say something, but she was afraid because this man was present."  Angeles suggested that Perez go somewhere else to speak, but Perez did not "want to because she was afraid."  Perez and her aunt made plans for Perez to return the following week. Perez typically spoke with or saw that aunt nearly every day.

Perez did not show up for work on December 5 or 6, 2020, which was "unusual" for her.  On December 5, McIntire called his mother at 9:30 a.m.  He was upset because Perez had called him while she was "very upset" and told him to leave the house immediately or she would call the police.  He said that Perez did not answer the phone when he called her back, and he did not find her at home.  McIntire's mother testified that she told him to bring her Celeste, but she confirmed that in another proceeding she had testified that McIntire asked her if she could take Celeste.  McIntire's mother testified in the other proceeding that "it was very unusual for [Perez] not to be with Celeste and to abandon her."

McIntire's mother told McIntire to meet her at a particular gas station, and he arrived there about one hour later with Celeste. He said that it took him so long to arrive because he had wanted to spend some time with Celeste. After McIntire gave Celeste to his mother, his mother looked for Perez at her home and called her several times. Perez did not answer, which was unlike her. McIntire's mother sent Perez a message telling her that she had Celeste; "that message was read."

Perez did not return to work after December 4, 2020. It was unusual for her to miss work. On December 5 or 6, a coworker of Perez's went to Perez's home. She saw McIntire leaving the home with a baby seat and asked him about Perez. He told her that Perez had left after an argument, and he did not know where she was. The coworker asked McIntire when he last saw Perez or heard from her, and in response McIntire "frowned," did not provide "a specific date," and "tried to change things."

Perez had no contact with any of her family members, friends, or coworkers after December 4, 2020. She was a devoted mother to Celeste, and no one believed that she would disappear without taking Celeste. Perez missed her doctor's appointment on December 14 and did not show up at her aunt's for dinner that week.

On December 4, 2020, Perez updated her profile picture on Facebook with a photograph of herself and Celeste taken at the Crooked Branch Way residence. Perez did not post on Facebook or update her profile picture after December 4. She previously was "very active" on Facebook. On December 7, her sister Brenda received the following

8

message from Perez on Facebook: "'Happy Birthday, Brenda.'" Angeles did not believe that the message was from Perez, because Perez only referred to Brenda by a nickname.

III.    *The initial investigation*

On December 11, 2020, Perez's family reported her missing. Her aunt identified McIntire as Perez's boyfriend and provided law enforcement the license plate number for his car, a grey Mazda. A sheriff's deputy discovered that McIntire had an outstanding arrest warrant relating to the July 2020 domestic violence incident with Perez.

Perez's family searched her rented room and found "[e]verything that belonged to" her, including a cell phone on which she took and stored photographs. Law enforcement searched the Crooked Branch Way residence on December 11 and 13, 2020. They found a lot of women's and infants' clothing and an envelope from Perez's employer bearing her name and containing $391. They also found paperwork from Perez's doctor concerning her pregnancy and recent appointment. Law enforcement did not find any blood or anything that might have been used as a weapon in a homicide in the Crooked Branch Way bedroom. There was no evidence that the room had recently been cleaned with bleach or painted.

On December 19, 2020, law enforcement arrested McIntire on the outstanding warrant and took possession of his car. Sometime between December 5 and December 19, 2020, McIntire's car had been spraypainted white. There were two baseball bats in the trunk and two stains in the car, but the stains and the baseball bats tested negative for blood.

9

A sheriff's investigator opined that the lack of blood in the bedroom and the car did not lead him to any conclusion about whether Perez had been killed. "There doesn't have to be biological evidence to kill somebody." He explained that a person "could be killed by strangulation, suffocation," and "[b]lunt force trauma does not necessarily cause a person to bleed."

IV.    *Cell phone data for December 5 and 6, 2020*

Law enforcement analyzed the call detail records of Perez's and McIntire's cell phones from December 4 through December 6, 2020. The call detail records included the location of the cell tower used by the phone when making or receiving a call. When a cell phone places or receives a call, it connects to a network through a cell tower. The general location of a cell phone can be traced by looking at the towers to which it connected. The location can be narrowed to about a 120-degree sector within the 360-degree area that is covered by the tower.

Law enforcement also analyzed the location history for Perez's Gmail account. Depending on a user's security preferences, Google can track a cell phone's GPS location for their Gmail account when a cell phone is on and not in airplane mode.

Perez's cell phone data showed that her phone was at her residence at 6:00 p.m. on December 4, 2020, and likely remained there until 8:45 a.m. the following morning. The phone reactivated at 7:25 a.m. on December 5 and connected to the tower "most likely" to be activated when she was at home (otherwise known as the "home tower"). Between 8:33 and 8:41 a.m. on December 5, Perez and McIntire exchanged seven short telephone

10

calls. McIntire's cell phone was initially located north of the residence, but it connected to the residence's home tower at 8:40 a.m.

At 9:21 a.m. and 9:22 a.m. on December 5, 2020, Diana's cell phone was located northeast of the residence. At 9:22 a.m., a call was made from the phone to Perez's employer, but the call did not connect. The phone had likely travelled on Highway 79. Perez's phone did not connect with any tower on December 5 after 9:22 a.m. At 9:39 a.m., the GPS data for her Gmail account showed that the phone was located in the Beaumont/Cherry Valley area. There was no additional activity on her phone that day. The investigator who analyzed the data opined that Perez's cell "phone was clearly off."

At 9:29 a.m. on December 5, 2020, McIntire's cell phone connected to a tower north of the location of Perez's phone at 9:21 and 9:22 a.m. Two minutes later, McIntire's cell phone connected to two towers showing that the phone was also travelling north on Highway 79 into Cherry Valley. At 9:31 a.m., McIntire called his mother, and the call lasted 30 seconds. McIntire again called his mother at 9:48 a.m., with his cell phone connected to a tower in Cherry Valley, where it remained until at least 10:09 a.m. On December 5, McIntire and his mother exchanged a total of 44 phone calls and 23 text messages, an unusually high volume of contact for them.

McIntire's cell phone travelled throughout the remainder of the day on December 5, 2020, connecting to towers near his residence and his mother's residence in Banning multiple times during the day and to towers located in Palm Desert and the rural desert areas of Anza and Aguanga, over 20 miles east of his residence. In the afternoon,

11

McIntire's phone connected with towers in the rural Wildwood Canyon area of Cherry Valley in the same area where the phone had connected earlier that morning. McIntire's phone later connected with towers near his residence and his mother's residence. The last connection for McIntire's phone that day was at 11:33 p.m., when it again connected in the Highland Springs and Cherry Valley area where the phone had been earlier that day. At 5:33 a.m. on the morning of December 6, 2020, McIntire's phone became active again, connecting in the same general area where it last activated the night before, "between Highland Springs and Cherry Valley," and it connected again in the same area a little over two hours later. The phone then activated at his mother's after 8:00 a.m. and returned to the same Cherry Valley area before noon.

On December 6, 2020, Perez's phone turned on. There were three GPS location hits from her Gmail account at 1:00 p.m. and 1:03 p.m. The hits were about 1.2 or 1.3 miles apart and showed that the phone was headed east toward Beaumont. At 1:10 p.m., McIntire's phone also traveled east and was located "somewhere within [the] overlap" of the towers in that area. At 1:48 p.m., McIntire's phone connected to a tower in the area of his residence. At 4:13 p.m. on December 6, Perez's phone connected for the last time with a tower in the general area of her residence. McIntire's next connected at 4:31 p.m. with a tower in the Beaumont area.

The investigator who analyzed the cell phone data could not conclusively state whether McIntire's and Perez's phones were together or apart at any given point on December 5 or 6, 2020.

The investigator also reviewed the call detail records and GPS data of Perez's cell phone for the 30 days before December 4, 2020. The volume of activity on her phone on December 5 and 6 was unusually low in comparison to the activity for the 30 days before December 4. For each of those 30 days, she "had an average of 381 Google location hits." On December 5, Perez's phone had 40 Gmail GPS location hits, and on December 6, it had three.

V.    *The search for Perez's body*

In 2022, law enforcement created maps from the call detail record activity for Perez's and McIntire's phones on December 5 and 6, 2020. Using those maps, law enforcement conducted two searches in rural areas, including the Wildwood Canyon area of Cherry Valley, in which they believed that McIntire could have disposed of Perez's body. They did not find her body. A sheriff's investigator who participated in the searches was not surprised that the searches were unsuccessful given the passage of time and the effects of the elements and possible "animal activity."

VI.    *Other efforts to locate Perez*

A law enforcement investigator assigned to the case in 2021conducted a proof of life investigation to find any evidence that Perez was alive after December 5, 2020, because "people don't normally just vanish." The investigator contacted local and southern California hospitals, mental health facilities, jails, coroner's offices, and United States Border Patrol. Officials in Tijuana determined that no one matching Perez's description had been delivered to their coroner's office.

13

Perez's family posted missing-person flyers and posted on social media that she was missing. Law enforcement also posted on social media, generating a nationwide audience but no leads. Sometime before Easter 2021, Perez's aunt received a text stating that someone found Perez and demanding $4,500 to see her before Easter. Perez's aunt asked the person to identify Perez's tattoos and knew from the response that the message was fake, because Perez did not have any tattoos. In January 2021, someone posted on Facebook that a red car was involved in Perez's disappearance, and family members reshared the post. Law enforcement later investigated both leads.

VII.   *Dependency case*

In a juvenile dependency proceeding, McIntire's parental rights to Celeste were terminated in January 2023. Perez's sister adopted Celeste. A social worker involved in the proceeding from September 2021 to April 2023 never had any contact with Perez. In the fall of 2022, McIntire texted his mother that he did not understand why Perez's family was "'scared'" of him now and "that he was more unbalanced before in the past."

VIII.   *The verdict and sentence*

The jury found McIntire not guilty of first and second degree murder as to both Perez and her fetus but found him guilty of the voluntary manslaughter of Perez (count 1) and the involuntary manslaughter of the fetus (count 2). The trial court dismissed count 2 pursuant to section 1385 because there is no crime of manslaughter of a fetus. The court sentenced McIntire to the upper term of 11 years in state prison for count 1.

14

DISCUSSION

I.     *Sufficiency of the evidence*

McIntire argues that there was insufficient evidence to support his voluntary manslaughter conviction because the record does not contain substantial evidence that Perez died or that he was responsible for the death.  We are not persuaded.

"Manslaughter is the unlawful killing of a human being without malice."  (§ 192.) The victim's body does not have to be found in order for the evidence to be sufficient to support a homicide conviction.  (*People v. Cullen* (1951) 37 Cal.2d 614, 624.)

"In reviewing a sufficiency of the evidence claim, our role is limited.  We review the entire record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt.  [Citation.] We draw all reasonable inferences in favor of the judgment.  [Citation.]  Matters of credibility of witnesses and the weight of the evidence are ""'the exclusive province'"" of the trier of fact."  (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11 (*Cardenas*).)  "'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'"  (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

There is overwhelming evidence that Perez died.  She abruptly disappeared and left behind her infant daughter, whom she loved dearly.  No one other than McIntire spoke with or saw Perez after December 4, 2020.  Before December 5, she spoke daily

15

with numerous family members with whom she had close relationships, but none had any contact with her after December 4. She stopped going to work and missed a prenatal appointment in December. She left behind all of her personal belongings, which included clothing, $391 in cash, and a cell phone on which she stored photographs. No one close to Perez believed that she would leave McIntire or disappear without taking Celeste. Even McIntire's mother admitted that it would be very unusual for Perez to abandon Celeste. When Perez left McIntire in July 2020, she took Celeste with her. Perez had recently told her sister that she wanted to leave McIntire, but she refused her sister's invitation to move to Mexico because she wanted Celeste to continue living in the United States. From all of that evidence, the jury could reasonably infer that what explained Perez's disappearance was that she had died. (See *People v. Ruiz* (1988) 44 Cal.3d 589, 610-611 [concluding that "ample circumstantial evidence" showed that the victim, whose body was never found, had died, "including her abrupt disappearance, her failure to contact friends, relatives, her physician and her pastor, her failure to seek resumption of Medi-Cal and Social Security payments, and her abandonment of several personal effects, including her purse"].)

There also was overwhelming evidence that McIntire killed Perez on December 5, 2020. He had a history of acting violently toward her, and she had an active restraining order against him. Perez told others that McIntire had threatened to kill her on multiple occasions.

McIntire was the last person to speak with Perez before she disappeared. After a short burst of phone calls between the two on the morning of December 5, 2020, McIntire's phone connected to the home tower from their residence, where Perez's phone was located at 8:40 a.m. The jury could reasonably infer that both McIntire and Perez were with their phones and at their residence when those calls concluded, around 8:45 a.m. McIntire told his mother that he and Perez had argued that morning, with Perez telling him to leave and threatening to call the police. Perez had recently spoken with one of McIntire's sisters about leaving him. Perez also told Christy that McIntire had previously threatened to kill her if she ever reported him to the police.

Perez's phone activity showed that her phone was located northeast of their residence a little over one-half hour after McIntire's phone connected to the home tower. McIntire's phone also connected in the same northeast area around the same time, with both phones probably having travelled east on Highway 79. The last GPS location for Perez's phone was in the rural area of Cherry Valley at 9:39 a.m., where McIntire's phone connected with a tower nine minutes later. McIntire's phone returned to that area several times throughout that day, including at 11:33 p.m., when it last connected. His phone was located in the same rural Cherry Valley area at 5:33 a.m. on December 6, and again two hours later. McIntire also had travelled to other rural desert areas on December 5.

Even though McIntire said that Perez had disappeared, her phone records on December 6, 2020, showed the phone travelling in the same direction as McIntire's and

17

in the same general area. Perez's phone last connected to the home tower after 4:00 p.m. that day, two and one-half hours after McIntire's phone connected to the home tower.

From all of that evidence, the jury could reasonably infer that McIntire killed Perez on the morning of December 5, 2020. The jury could reasonably infer that he had a motive to kill her, because she threatened to call the police and McIntire had previously threatened to kill her if she did that. The jury could reasonably infer from the phone records that McIntire possessed and travelled with Perez's phone after he claimed that she had disappeared. Moreover, given that McIntire had told a previous girlfriend that he would dispose of the body if he ever killed someone, and given McIntire's extensive travel to and significant amount of time spent in rural areas on December 5 and 6, the jury could reasonably infer that McIntire was disposing of Perez's dead body.

McIntire's arguments to the contrary are unpersuasive. He contends that the evidence is insufficient because (1) there was no blood found in Perez's bedroom or McIntire's car, (2) law enforcement did not thoroughly investigate leads generated by the missing-person flyers and social media posts, (3) the evidence was not conclusive that Perez's and McIntire's phones were together on December 5, 2020, as opposed to travelling in the same general direction, and, (4) Perez could have just disappeared because of the argument with McIntire or "for any number of reasons." All of those arguments concern only the weight of the evidence and alternate inferences that the jury could have drawn. We do not reweigh the evidence on appeal. (*Cardenas*, *supra*, 53 Cal.App.5th at p. 119, fn. 11.)

18

For these reasons, we conclude that McIntire's challenge to the sufficiency of the evidence supporting the manslaughter conviction fails.

## II. *Prior acts evidence*

McIntire contends that the trial court abused its discretion by admitting evidence of his prior acts of domestic violence against his former girlfriend. The contention lacks merit.

### A. *Relevant proceedings*

The People moved in limine to introduce evidence of McIntire's prior uncharged acts of domestic violence against Ana and Perez. With respect to Ana, the People moved to admit evidence of the April 2020 incident of domestic violence that led Ana to call the police. McIntire objected on the ground that the probative value of the evidence was substantially outweighed by its possible prejudicial impact.

At the hearing, the court noted that the case was "a domestic violence case because of the relationship between the defendant and the alleged victim," so evidence of prior acts of domestic violence is admissible under Evidence Code section 1109. The court analyzed the admissibility of the evidence under Evidence Code section 352, and the court concluded that it would admit evidence of "the incident dealing with Ana G[.] from April of 2020."

During deliberations, the jury asked to have all of Ana's testimony read back.

B.    *Analysis*

In general, "evidence of a person's character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) The general prohibition against admitting propensity evidence is subject to the exception set forth in Evidence Code section 1109, which provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 [of the Evidence Code] if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (Evid. Code, § 1109, subd. (a); *People v. Baker* (2021) 10 Cal.5th 1044, 1089.)

Evidence Code section 352 provides that a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against [the] defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Bolin* (1998) 18 Cal.4th 297, 320; *People v. Barrett* (2025) 17 Cal.5th 897, 954-955 (*Barrett*).)

When a trial court rules on the admissibility of evidence of prior acts of domestic violence, "the trial court's determination should be guided by such factors as the 'nature,

20

relevance, and possible remoteness' of the evidence, 'the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.'" (*People v. Dworak* (2021) 11 Cal.5th 881, 900; *People v. Thomas* (2021) 63 Cal.App.5th 612, 630.)

In arguing that the trial court abused its discretion by admitting Ana's testimony about the prior domestic violence, McIntire assumes that *all* of Ana's testimony was admitted as prior bad acts evidence under Evidence Code sections 1109 and 352, including the testimony that McIntire "told her if she dated anyone else, he would kill them, and dump their bodies at the Indian reservation." The record does not support that characterization. The court stated that it was admitting Ana's testimony about the violent incident in April 2020 under Evidence Code sections 1109 and 352. McIntire's statements about killing anyone else Ana dated and how he would dispose of a dead body were not made during the April 2020 incident. That testimony therefore was not admitted pursuant to the court's in limine ruling. Defense counsel did not object to the admission of that testimony, so any objection has been forfeited. (Evid. Code, § 353.) We accordingly only analyze whether the trial court abused its discretion under Evidence

21

Code sections 1109 and 352 by admitting the evidence concerning the April 2020 domestic violence incident.

There is nothing arbitrary, capricious, or patently absurd about the court's ruling that the evidence of the April 2020 incident was admissible to prove McIntire's propensity to act violently toward and threaten his romantic partners. The probative value of the evidence was high. The evidence that McIntire acted violently toward Ana and warned that she should fear him tended to show that McIntire had a propensity to act violently toward his romantic partners. It corroborated the evidence that McIntire had acted violently toward Perez and threatened her. His violence against Ana—pushing her but not leaving any marks—was similar to his violence against Perez. Perez told her sister and her ex-boyfriend's mother that McIntire had pushed her, and she explained to her sister that McIntire pushed her a lot and abused her in ways that tended not to leave marks. In addition, the April 2020 incident involving Ana was very recent, having taken place just a few months before the July 2020 domestic violence incident involving Perez and less than one year before she disappeared.

Given the evidence's high probative value, "we cannot say that the trial court abused its discretion when it concluded that the danger of undue prejudice did not substantially outweigh the probative value of the testimony." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 826.) The details of the prior conduct were far less inflammatory than the evidence of the charged offenses or other incidents of domestic violence involving Perez. McIntire's violence against Ana did not cause any physical

injuries. The evidence of the uncharged conduct involving Ana therefore was not likely to evoke any more emotional bias against McIntire than the evidence of the charged offenses. And the risk that the jury might punish McIntire for the uncharged act of violence against Ana was minimal.

McIntire argues that the evidence was "extremely prejudicial" and must have "had an impact on the jury" because the jury asked to have Ana's testimony read back. But the jury's request to have the testimony read back shows only that the jury was interested in the testimony. It does not follow that the testimony biased or inflamed the jury. Rather, the jury may have been interested in the testimony because of its probative value, i.e., its tendency to prove McIntire's guilt. That is not the type of prejudice that Evidence Code "'section 352 [was] designed to avoid.'" (*Barrett*, *supra*, 17 Cal.5th at p. 954.) Moreover, the jury's request for readback of Ana's testimony may have been motivated by interest in the testimony about McIntire's threat to kill anyone Ana dated and his claims about disposing of the body if he ever killed someone. Again, no objection to that testimony has been preserved.

Finally, McIntire also contends that "[t]he admission of the incident involving Ana only served to reinforce in the jurors['] mind[s] that if [McIntire] acted in a certain manner on a previous occasion, he must have done so on this occasion, thereby lessening the prosecution's burden of proof." McIntire does not provide any legal analysis or cite any authority to support the argument, so it is forfeited. (*People v. Smith* (2003) 30 Cal.4th 581, 616, fn. 8.) It also fails on the merits. "Evidence Code section 1109 does

23

not lessen the prosecution's burden of proof, because a properly instructed jury will be told the defendant is presumed innocent and the prosecution must prove him guilty beyond a reasonable doubt in order for the jury to convict." (*People v. Johnson* (2000) 77 Cal.App.4th 410, 420.) McIntire's jury was so instructed.

For all of these reasons, we conclude that the trial court did not abuse its discretion by admitting evidence of the prior domestic violence against Ana.

III.    *The upper term*

Voluntary manslaughter is punishable by a term of three, six, or 11 years. (§ 193, subd. (a).) McIntire contends that the trial court prejudicially erred by sentencing him to the upper term on the basis of "improper and unauthorized aggravating circumstances." (Capitalization omitted.) We disagree.

A.    *Relevant proceedings*

During trial, defense counsel asked the court to take judicial notice that in January 2021 McIntire pled guilty to a violation of section 273.5 based on the July 2020 domestic violence incident with Perez. The court denied the request.

The probation department recommended that the court sentence McIntire to the upper term of 11 years if the court found any aggravating circumstances true. The probation report stated that McIntire had the following prior convictions: (1) a 2017 misdemeanor violation of section 25850, subdivision (c)(7); (2) convictions in January 2020 for a felony violation of section 29815 and a misdemeanor violation of section

24

21810; and (3) convictions in January 2021 for a felony violation of section 273.5, subdivision (a), and a misdemeanor violation of section 273.6, subdivision (a).

The information alleged that McIntire was ineligible for probation under section 1203.075 subdivision (a)(1), because McIntire personally inflicted great bodily injury during the commission of the charged offenses within the meaning of section 12022.7.[1] McIntire waived a jury determination on the issue. At sentencing, the court found that McIntire was ineligible for probation under that provision because he had inflicted great bodily injury on Perez. The court also expressly found that even if the probation limitation in section 1203.075 did not apply, probation was still inappropriate.

The court imposed the upper term of 11 years in light of the aggravating factor of McIntire's prior convictions. The court had reviewed and considered the probation report, and the court described each of McIntire's convictions. The court noted that it was permitted "to consider any certified prior convictions" and that McIntire had "admitted these prior convictions" in that he "testified—admitted [the prior convictions] when he testified." With respect to the convictions, the court also commented: "These are all local cases. The Court has reviewed its own records, find that you had these prior convictions, and again, they were serious in nature."

---

[1]    Section 1203.075, subdivision (a), provides: "Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, nor shall a finding bringing the defendant within this section be stricken pursuant to Section 1385 for, any person who personally inflicts great bodily injury, as defined in Section 12022.7, on the person of another in the commission or attempted commission of" certain enumerated offenses not including manslaughter.

After the court imposed the sentence, defense counsel remarked: "Just a final matter, Number 1, I think the Court stated that Mr. McIntire testified, and I just wanted to make sure that we corrected that. He did not testify. I understand that the Court can still use his priors in an aggravated sentence, but I want to make sure that correction was reflected." The court acknowledged that defense counsel was correct that McIntire did not testify, and the court clarified that it meant that "there were no issues during the trial regarding the priors" in that there had been numerous discussions about the prior convictions being admitted, including at the request of defense counsel. The court explained: "It was always understood that those convictions were, in fact, in place, and that's what I meant, that he was not disputing and had admitted that those prior convictions had occurred." Defense counsel did not object to those statements.

B.      *Analysis*

Section 1170 imposes limits on a trial judge's discretion in choosing between the low, middle, and upper terms of a sentencing triad. (*People v. Lynch* (2024) 16 Cal.5th 730, 748; § 1170, subd. (b)(1)-(2).) Notwithstanding those limitations, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3); *Lynch*, at p. 748.)

McIntire first contends that when the trial court imposed the upper term, the court improperly relied on the aggravating circumstances of the great bodily injury finding and the probation limitation. The record does not support the contention. The trial court did

26

not rely on either of those findings as aggravating factors that supported imposition of the upper term. The court repeatedly stated that the only aggravating factor that it considered in determining whether to impose the upper term was McIntire's prior convictions. The court relied on the great bodily injury finding only in determining that McIntire was ineligible for probation under section 1203.075. Because the record demonstrates that the trial court did not rely on either the great bodily injury finding or the probation limitation as aggravating factors to support imposition of the upper term, we reject McIntire's argument.[2]

McIntire next argues that the trial court improperly relied on the prior convictions without certified records of conviction. The People contend that McIntire forfeited the argument, and we agree. "A party in a criminal action forfeits appeal of the superior court's discretionary sentencing choices if the party had a meaningful opportunity to object in the superior court yet did not, unless the sentence is legally unauthorized." (*People v. Sarmiento-Zuniga* (2025) 108 Cal.App.5th 1216, 1222 (*Sarmiento-Zuniga*).) That "'rule applies when the trial court "clearly apprise[s]" the parties "of the sentence

---

[2] In his reply brief, McIntire argues that even if the trial court relied on the great bodily injury finding only in denying McIntire probation, the separate finding of great bodily injury was inappropriate and unauthorized because great bodily injury enhancements do not apply to murder and manslaughter. (See *People v. Cook* (2015) 60 Cal.4th 922, 935 [great bodily injury enhancements under § 12022.7, subd. (g), "simply do not apply to murder or manslaughter"].) The argument is forfeited because McIntire raises it for the first time in his reply brief and has not shown good cause for failing to raise it sooner. (*People v. Newton* (2007) 155 Cal.App.4th 1000, 1005.) Moreover, McIntire cannot demonstrate prejudice from the claimed error, because the trial court expressly found that probation would be inappropriate even without the great bodily injury finding.

the court intends to impose and the reasons that support any discretionary choices" [citation], and gives the parties a chance to seek "clarification or change" [citation] by objecting to errors in the sentence. The parties are given an adequate opportunity to seek such clarifications or changes if, at any time during the sentencing hearing, the . . . court describes the sentence it intends to impose and the reasons for the sentence, and the court thereafter considers the objections of the parties before the actual sentencing.'" (*Ibid.*)

That is what happened here. The trial court apprised McIntire that it was imposing the upper term based on the aggravating factor of his prior convictions, each of which the court specifically described. The court stated that it had reviewed the probation report and the court's own records to verify those convictions. At no point during the sentencing hearing did McIntire object to the court's reliance on the prior convictions because the court did not have certified records of those convictions. Instead, when McIntire's attorney corrected the trial court's statement that McIntire had testified about the convictions, defense counsel affirmatively stated that the court could nevertheless "still use his priors in an aggravated sentence." As *Sarmiento-Zuniga* explained in analyzing the same issue, had McIntire objected to the court's reliance on the prior convictions without certified records of conviction, the issue "'could have been readily resolved.'" (*Sarmiento-Zuniga*, *supra*, 108 Cal.App.5th at p. 1222.) Given the lack of objection, the argument on appeal is forfeited. (*Ibid.*)

28

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.